FENNEMORE CRAIG, P.C.
Anthony W. Austin (No. 025351)
Philip L. Brailsford (No. 032074)
2394 East Camelback Road, Suite 600
Phoenix, AZ 85016-3429
Telephone: (602) 916-5000
Email: aaustin@fclaw.com
Email: pbrailsford@fclaw.com

*Attorneys for Plaintiff*
*HIP Lending Group, LLC*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| HIP Lending Group, LLC, an Arizona limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>Goalz Restaurant Group, LLC, a Wyoming limited liability company; Goalz CD Pooler GA, LLC, a Wyoming limited liability company; Goalz Dairy Denver NC, LLC, formerly known as Goalz DQ Denver NC, LLC, a Wyoming limited liability company; Goalz Dairy Ft Pierce FL, LLC, a Florida limited liability company; Goalz DH Springs CO, LLC, a Wyoming limited liability company; Goalz DH Georgetown KY 111, LLC, a Wyoming limited liability company; Goalz DH IL 107, LLC, an Illinois limited liability company; Goalz DH IL 109, LLC, an Illinois limited liability company; Goalz DH Slidell LA 112, LLC, a Wyoming limited liability company; Goalz Restaurant Group COWY, LLC, a Wyoming limited liability company; Goalz Restaurant Group FLA, LLC, a Wyoming limited liability company; Goalz Restaurant Group KTY, LLC, a Wyoming limited liability company; Goalz Restaurant Group NCSC, LLC, a Wyoming limited liability company; and Shawn Eby, a Wyoming resident,<br><br>Defendants. | No:<br><br>**MOTION FOR THE APPOINTMENT OF RECEIVER**<br><br>**Expedited Relief Requested** |

This Motion for the Appointment of Receiver (the "Motion") is submitted by Plaintiff HIP Lending Group, LLC ("Plaintiff") and is supported by the following

Memorandum of Points and Authorities, exhibits, and the Declaration of R. Craig Hannay attached hereto as **Exhibit 1** (the "Declaration").  Defendants Goalz Restaurant Group, LLC, Goalz CD Pooler GA, LLC, Goalz Dairy Denver NC, LLC, formerly known as Goalz DQ Denver NC, LLC, Goalz Dairy Ft Pierce FL, LLC, Goalz DH Springs CO, LLC, Goalz DH Georgetown KY 111, LLC, Goalz DH IL 107, LLC, Goalz DH IL 109, LLC, Goalz DH Slidell LA 112, LLC, Goalz Restaurant Group COWY, LLC, Goalz Restaurant Group FLA, LLC, Goalz Restaurant Group KTY, LLC, Goalz Restaurant Group NCSC, LLC, and Shawn Eby (collectively "Defendants") are in default of the Second Amended Loan Agreement (defined below).  Accordingly, the Collateral (defined below) and Plaintiff's rights therein need to be protected, and Defendants consented to the appointment of a receiver in the Second Amended Loan Agreement.  *See* Complaint Exhibit E Section 9.2.

## **MEMORANDUM OF POINTS AND AUTHORITIES**

### I.  **FACTUAL BACKGROUND**

### A.  **Corporate Structure**

1. Defendants are part of a corporate family of entities that operate quick service restaurants in Wyoming, Colorado, Illinois, Kentucky, Florida, Georgia, North Carolina, South Carolina, and Louisiana.  These restaurants are operated pursuant to franchise agreements with Dog Haus, Church's Chicken, Dairy Queen, and Captain D's.

2. In general, Goalz Restaurant Group, LLC ("GRG") owns membership interests in all of the corporate Defendants either directly or indirectly (the "Subsidiary Guarantors").  *See* Complaint Exhibit A.

3. GRG operates as the management company for the Subsidiary Guarantors in the operation of the respective quick service restaurant owned by the particular Defendant.

4. In addition to the Subsidiary Guarantors, GRG directly holds majority membership interests in the following entities:

    a.    DH Cheyenne WY, LLC

    b.    CD Lincolnton NC, LLC

    c.    CD Lancaster SC, LLC

   d. CD Shelbyville KY, LLC

   e. Dairy Commerce City CO, LLC

   f. Dairy Fed Highway FL, LLC

   g. Dairy Traditions FL, LLC

  5. Through its wholly owned holding company Goalz Restaurant Group COWY, LLC, GRG holds majority membership interests in CC Cheyenne WY, LLC.

  6. Through its wholly owned holding company Goalz Restaurant Group FLA, LLC, GRG holds majority membership interests in CC Apopka FL, LLC and CC Melbourne FL, LLC.

  7. Through its wholly owned holding company Goalz Restaurant Group KTY, LLC, GRG utilizes the trade name CC Dixie Highway.

  8. Through its wholly owned holding company Goalz Restaurant Group NCSC LLC, GRG utilizes the trade name CC Huntsville AL and holds majority membership interests in:

   a. CC Lincolnton NC, LLC

   b. CC Lancaster SC, LLC

(collectively, these entities are referred to as the "Subsidiary LLCs").

  9. Mr. Eby serves as Defendants' President and Chief Executive Officer.

**B. Plaintiff's Loans to Defendants**

  10. In September 2018, Defendants and Plaintiff entered into a loan agreement through which Plaintiff agreed to, and did, loan $800,000 through multiple advances (the "Loan Agreement"). *See* Complaint Exhibit B.

  11. In connection with the Loan Agreement, Defendants granted a security interest in the following assets whether then owned or subsequently acquired or created:

> All Accounts, Chattel Paper, Goods (including all Inventory, Equipment and Fixtures), Documents, Instruments, General Intangibles (including Payment Intangibles), Investment Property, Letter-of-Credit Rights, Supporting Obligations, Commercial Tort Claims, Other Property, and Borrower's limited liability membership interests in its Subsidiaries; all Proceeds and products of all of the foregoing (including

>                   Proceeds of any insurance policies and claims against third
>                   parties for loss or any destruction of any of the foregoing); and
>                   all Records relating to any of the foregoing.

(the "Collateral"). *See* Complaint Exhibit B Section 5.1 (defined terms above are defined in Exhibit B to the Complaint). Plaintiff perfected its security interest in the Collateral by filing UCC-1 Financing Statements in the respective states. *See* Complaint Exhibit C.

12. The Subsidiary Guarantors guaranteed the obligations under the Loan Agreement and agreed that each is "jointly and severally liable for, and absolutely and unconditionally guarantees to Lender the prompt payment and performance of, all Obligations." *See* Complaint Exhibit B Section 12.1.

13. In March 2019, Defendants required additional capital and the Loan Agreement was amended to provide for additional advances totaling $1,000,000.00, which was funded by Plaintiff (the "Amended Loan Agreement"). *See* Complaint Exhibit D.

14. In connection with the Amended Loan Agreement, Defendants granted a security in the Collateral, which was perfected by Plaintiff through the filing of UCC-1 Financing Statements. *See* Complaint Exhibit C.

15. As with the Loan Agreement, each Subsidiary Guarantor unconditionally guaranteed the amounts borrowed. *See* Complaint Exhibit D Section 12.1.

16. One month later, additional funds were required by Defendants and the parties entered into the Second Amended and Restated Loan, Guaranty and Security Agreement, which increased the amount borrowed (and actually loaned) to $3,000,000.00 (the "Second Amended Loan Agreement"). *See* Complaint Exhibit E.

17. In connection with the Second Amended Loan Agreement, Defendants granted a security in the Collateral, which was perfected by Plaintiff through the filing of UCC-1 Financing Statements. *See* Complaint Exhibit C.

18. As with the Loan Agreement and Amended Loan, each Subsidiary Guarantor unconditionally guaranteed the amounts borrowed. *See* Complaint Exhibit E Section 12.1. Moreover, just like it did with the Loan Agreement and Amended Loan, GRG covenanted and agreed that, as GRG created new Subsidiaries (defined as those entities which GRG

held 51% or more of the membership interests), those entities would become guarantors under the Second Amended Loan Agreement. *See* Complaint Exhibit E Section 8.2 (identical provisions are contained in the Loan Agreement and Amended Loan Agreement).

19. The Second Amended Loan Agreement was to be repaid through thirty-six (36) monthly payments of accrued interest and principal beginning on January 1, 2020. Each monthly payment was due on the first of each month until paid in full. The entire principal balance of the loan was due with all interest, fees, and other charges on January 1, 2023 if not otherwise accelerated.

20. Interest accrues on the principal balance at the rate of fifteen percent. After an event of default, interest accrues at the default rate of twenty-five percent.

**C.  Defendants' Operations Struggle**

21. As hinted at above, Defendants have consistently had cash flow issues that have hampered their operations and ability to repay obligations – including Plaintiff's loan.

22. Despite the $3,000,000.00 loan to Defendants, the operations of Defendants have consistently lost money to the point that Defendants have struggled to make payroll without additional advances from Plaintiff.

23. Subsequent to the Second Amended Loan Agreement, Plaintiff made these additional loans to Defendants.

24. In August 2019, GRG caused the Goalz Restaurant Group NCSC LLC restaurant known as CC Huntsville AL to cease operations and close down. Goalz Restaurant Group NCSC LLC conducted the closure without notifying Church's Chicken, the franchisor. Upon Church's Chicken learning of the closure, GRG was able to avoid a complete termination of the franchise agreement by entering into a promissory note in the amount of $283,093.00 for the damages suffered by the franchisor. *See* Complaint Exhibit G. The note provides that any default thereunder is a default upon all franchise agreements with the franchisor. *Id.* at ¶ 6. In early March 2020, GRG and Goalz Restaurant Group NCSC, LLC failed to make the requisite payments and a notice of default was sent. *See* Complaint Exhibit H.

25. In addition to the financial defaults, Defendants received on March 5, 2020 two notices of default for failure to abide by the operational terms of the franchise agreement with Church's Chicken. *See* Complaint Exhibit I. As noted above, these violations threaten the franchise agreements for all Defendants who operate under the Church's Chicken flag.

26. As of February 2020, Defendants had outstanding payables (not including payments to Plaintiff) in excess of $1,000,000.00.

27. Despite these struggles and serious cash flow issues, Defendants have, at Mr. Eby's direction, prioritized the payment of Mr. Eby's guaranteed payments (i.e. his salary) over other creditors – including rent, utilities, and payroll. *See* Complaint Exhibit J.

28. Further in February 2020, Defendants, at Mr. Eby's direction, increased Mr. Eby's wife's salary from $50,000 to $75,000 despite consistent shortfalls in making payroll and payment of other expenses.

29. At that same time, Defendants also increased the pay of Defendants' marketing person from $50,000 to $65,000 with no explanation.

30. Plaintiff is further informed that in early March 2020, Defendants have received disconnect notices from various utilities for non-payment. *See* Complaint Exhibit K.

31. Additionally, Defendants have received notices of default from landlords of various stores with the threat of lockouts being instituted if payment is not received. *See* Complaint Exhibit L.

**D. Goalz Default**

32. In addition to the financial and managerial issues discussed above, Defendants have failed to make any payment to Plaintiff as required under the Second Amended Loan Agreement.

33. On March 2, 2020, Plaintiff hand delivered a notice of default and opportunity to cure to Mr. Eby as required by the Second Amended Loan Agreement. See Complaint

Exhibit M.  Defendants had five days to cure the defaults set forth therein or an event of default will have been deemed to occur.

34. Upon an event of default, Plaintiff is entitled to exercise a variety of remedies, including acceleration, imposition of default interest rate, and foreclosure.  Defendants have also agreed that Plaintiff "may, in its discretion, petition for and obtain the appointment of a receiver to take possession of any or all of the Collateral and to operate any Obligor's business and to exercise such rights and powers as the court appointing such receiver shall confer upon such receiver . . . ."  *See* Complaint Exhibit E Section 9.2.

35. Despite the notice and opportunity to cure, Defendants failed to cure, or make any arrangements to cure, the defaults under the Second Amended Loan Agreement.

36. On March 10, 2020, Plaintiff delivered its notice of acceleration and demand for payment of the amounts due under the Second Amended Loan Agreement.  *See* Complaint Exhibit N.  As of March 9, 2020, Defendants were obligated to Plaintiff in the amount of $3,377,869.48, which represents outstanding principal and accrued interest.  In addition to these amounts, Plaintiff is entitled to its attorneys' fees and costs.

37. Given the deteriorating nature of the Defendants' financial situation, the threatened termination of the franchise agreements, looming utility disconnections, and potential lockouts by landlords, a receiver is necessary to protect Plaintiff's collateral from further deterioration.

## II. ARGUMENT

### A. The Legal Standard For Appointment Of A Receiver.

"[F]ederal law governs the issue of whether to appoint a receiver in a diversity action."  *Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837, 843 (9th Cir. 2009); *see also* Fed. R. Civ. P. 66.  A court's decision whether to appoint a receiver is reviewed on an abuse of discretion standard.  *Canada Life Assur. Co.*, 563 F.3d at 844.  "[T]here is 'no precise formula for determining when a receiver may be appointed.'"  *Id. quoting Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316 (8th Cir. 1993).  Rather, federal courts consider a variety of factors in making this determination, including whether: (1) the

plaintiff has a valid claim; (2) the defendant has either engaged or is likely to engage in fraud; (3) the property is in imminent danger of dissipation; (4) available legal remedies are inadequate; (5) the harm to the plaintiff by denial of receivership would outweigh injury to the defendant; (6) "plaintiff's probable success in the action and the possibility of irreparable injury to plaintiff's interest in the property"; and (7) "plaintiff's interests sought to be protected will in fact be well-served by receivership." *Canada Life Assur. Co.,* 563 F.3d at 844 (citations and quotations omitted). No single factor is dispositive, but the Court is granted broad discretion in appointing a receiver. *Id.* at 845.

"Because receivership interferes very seriously with the defendant's property rights, a party seeking . . . receiver[ship] must generally show that he has some 'legally recognized right' in the property, such as a security interest, that amounts to more than a mere claim against the defendant." *Paradise v. USPLabs, LLC,* No. SA CV 16-0200-DOC (KESx), 2016 WL 11505594, at *4 (C.D. Cal. Apr. 11, 2016) (quotation omitted); *see Office Depot Inc. v. Zuccarini,* 596 F.3d 696, 702–03 (9th Cir. 2010) (affirming district court's appointment of receiver to obtain and sell domain names owned by judgment debtor to satisfy judgment); *Aviation Supply Corp.,* 999 F.2d at 316–17 (upholding, in action for breach of contract, appointment of receiver on motion of judgment creditor when it appeared that judgment debtor was hiding assets).

"Creditors with a security interest in property have a well-established interest in the property sufficient to support the appointment of a receiver." *Brill & Harrington Inv. v. Vernon Sav. & Loan Ass'n*, 787 F. Supp. 250, 253 (D. D.C. 1992); *see also View Crest Garden Apartments v. United States,* 281 F.2d 844 (9th Cir. 1960), *cert. denied,* 364 U.S. 902 (1960); 12 Charles A. Wright et. al., *Fed. Prac. & Proc. Civ.* § 2983, Appointment of Receivers (3d ed. 2019).

**B.**     **Analysis.**

A receiver is necessary to protect Plaintiff's interests in the Collateral. Applying the *Canada Life* factors, it is readily apparent that a receiver is necessary to prevent waste and loss and to protect Plaintiff's interests.

### 1. Valid Claim

Here, there can be no serious dispute that Plaintiff holds a claim against Defendants and holds a valid security interest in the Collateral.  Plaintiff loaned substantial sums to Defendants pursuant to the Second Amended Loan Agreement for which it has not been repaid.  Those funds are now due and owing and no payment has been made by Defendants.  Accordingly, Plaintiff holds claims of breach of contract and guaranty against Defendants, which are valid and actionable.

Additionally, Plaintiff has a valid security interest in substantially all of the assets of the Defendants, including the subsidiaries of GRG.  Defendants pledged their assets (including membership interests held by GRG) as security for Plaintiff's claims.  The security interests were validly perfected as required by the Uniform Commercial Code.  Accordingly, Plaintiff holds claims and interests against Defendants and in the Collateral.

### 2. Existence or Likelihood of Fraud

Plaintiff at this time is unaware of the existence of fraud by the Defendants.  However, Plaintiff is aware of substantial mismanagement that causes Plaintiff considerable concern over the Defendants' ability to operate while insolvent.  Plaintiff is aware that in the midst of this financial crisis, Defendants, at the direction of Mr. Eby, caused significant salary increases to be made to Mr. Eby's wife and the marketing director.  Additionally, Defendants, at Mr. Eby's direction, have prioritized the payment of Mr. Eby's guaranteed payments over the payment of other debts.

### 3. Danger of Property Dissipation

Defendants' assets are in substantial risk of dissipation.  As noted above, landlords have begun to threaten to lock out Defendants from the various stores.  If such a lockout occurs, it will have a detrimental impact on the Collateral as Defendants may lose the right to possession under the leases, employees will find other employment, and franchisors are likely to declare defaults under the respective franchise agreements and terminate their agreements with the Defendants.

Further, Defendants' failure to meet payroll obligations may result in employees going unpaid, which can result in substantial liability to Defendants as well as the resignation of employees. It is axiomatic that without employees, a quick service restaurant (or any business) cannot operate and will be forced to close, which then implicates the potential defaults under the franchise agreements and ultimate termination.

Unsurprisingly, Defendants are in danger of losing the franchise agreements for lack of payment of franchise fees and other defaults. Should these agreements be terminated, the Collateral's value will be substantially reduced as much of Defendants' operational viability is centered around a particular franchisor. Revoking any franchise agreement, let alone multiple franchise agreements, will cause substantial harm to the Collateral.

### 4. Inadequacy of Available Legal Remedies

Receivership is the only appropriate legal remedy available to Plaintiff to protect the Collateral and provide any sort of payment to Plaintiff on its claims. No other legal remedy is available to Plaintiff that allows for the continued operation of Defendants while simultaneously protecting the assets from dissipation and forfeiture.

### 5. Harm of Denial of Receivership Outweighs Injury to Defendants

Plaintiff recognizes the substantial interference a receivership creates for Defendants' assets and operations. However, Defendants are staring into the abyss with landlords, franchisors, and other creditors starting the process to collect on their claims. Accordingly, the future of Defendants is one in which there is a substantial likelihood they will not be in business in a matter of weeks.

Viewed in this light, the appointment of a receiver who will take possession of the Collateral and protect it from forfeiture and dissipation will actually provide value to the Defendants. Through the receivership process it is possible the Collateral may be sold and funds returned to the estate for the benefit of creditors aside from Plaintiff. Left unprotected, the assets of Defendants will be pulled apart by the landlords and terminated by the franchisors until there is little of value to anyone.

**6.**     **Probability of Success and Possibility of Irreparable Harm**

As discussed above, Plaintiff's claims against Defendants has a high probability of success. The facts and documents cannot be reasonably disputed. Defendants borrowed $3,000,000.00 from Plaintiff and promised to repay those funds. To do so, they pledged their assets as collateral. They have failed to repay the $3,000,000.00 and therefore Plaintiff is entitled to pursue its remedies and collect from Defendants.

With respect to the possibility of irreparable harm, the documents Plaintiff are aware of and has provided the Court with its Verified Complaint demonstrate that several locations are either in danger of being locked out by the landlords or having the franchise agreement terminated. Once these acts occur, it will have a serious impact on Defendants' ability to operate and on the value of the Collateral. Further, once possession is terminated or the franchise agreements are revoked, it is not possible for Defendants to regain those assets or for Plaintiff to pursue its security interests in those assets. Irreparable harm is likely to occur, and occur soon, if the Collateral is not protected.

**7.**     **Suitability of Receivership**

Receivership is the appropriate remedy here as discussed previously. Additionally, given the multiple states in which Defendants operate, only a federal receivership with its extra-territorial reach can protect all of the Collateral. Through a receivership the assets will be protected, stores may be operated and even turned profitable, and the Collateral sold as going concerns to potential buyers.

Further, and crucially, Defendants consented to the appointment of a receiver in the Second Amended Loan Agreement. As each of the Loan Agreements have stated, Defendants agreed and consented that Plaintiff may "obtain the appointment of a receiver to take possession of any or all of the Collateral and to operate any Obligor's business and to exercise such rights and powers as the court appointing such receiver shall confer upon the receiver . . . ." *See* Complaint Exhibits B, D, and E Section 9.2. Defendants, having defaulted on the Second Amended Loan Agreement, cannot now object or claim that Plaintiff is not entitled to the relief requested herein.

### III. **BILL HUGHES IS AN APPROPRIATE RECEIVER**

Attached as **Exhibit 2** is the resume of Bill Hughes, a C.P.A. with considerable experience as a receiver, chief restructuring officer, and chapter 11 trustee. Mr. Hughes has the requisite qualifications necessary to discharge the responsibilities of a receiver in this matter. Mr. Hughes has consented to accept the appointment, and has no prior affiliation or association with Plaintiff.

### IV. **CONCLUSION**

For the foregoing reasons, Plaintiff requests the Court to order the appointment of a receiver to: (1) take possession and charge of the collateral described in the parties' April 29, 2019 Second Amended and Restated Loan, Guaranty and Security Agreement, including the Subsidiary LLCs; (2) manage and care for the Collateral and Subsidiary LLCs and exercise all rights available at law with respect to the Collateral and Subsidiary LLCs, including the right to operate the businesses of Defendants and sale the Collateral and Subsidiary LLCs; and (3) carry out such further orders as the Court deems just and proper.

Plaintiff also requests the Court to issue an order restraining Defendants and their agents and any creditor of Defendants from interfering with the Collateral and Subsidiary LLCs in any manner during the course of the receivership, and ordering Defendants and their agents to turn over to the receiver all of the Collateral and Subsidiary LLCs.

DATED this 16th day of March, 2020.

FENNEMORE CRAIG, P.C.

By *s/ Anthony W. Austin*
Anthony W. Austin
Philip L. Brailsford
*Attorneys for Plaintiff*
HIP Lending Group, LLC