1
2
3
4
5
6                **IN THE UNITED STATES DISTRICT COURT**
7                    **FOR THE DISTRICT OF ARIZONA**
8
9    HIP Lending Group LLC,                    No. CV-20-00544-PHX-DJH
10                    Plaintiff,               **ORDER**
11   v.
12   Goalz Restaurant Group LLC, et al.,
13                    Defendants.
14

15        Plaintiff filed their Complaint (Doc. 1) and accompanying Motion for the

16   Appointment of Receiver (Doc. 4) on March 16, 2020.  Defendants filed a Response

17   (Doc. 28) and Plaintiff filed a Reply (Doc. 28).  On May 12, 2020, the Court held a hearing

18   on the Motion ("Motion Hearing").  (Doc. 34).  At the conclusion of the Motion Hearing,

19   the Court took the matter under advisement.  Shortly thereafter, the Court granted the

20   Motion and stated that a written order would follow.[1]  (*Id.*)  This is that Order.[2]

21   ---
     [1]      Defendants have filed a Motion for Reconsideration of this Court's Order granting
22   HIP Lending's Motion for Appointment of Receiver.  (Doc. 39).  Therein, Defendants
     provide, "HIP [Lending's] failure to propose appropriate terms for a receiver on an interim
23   or permanent basis, its proposal to appoint very expensive and overwhelmingly costly
     receivers, together with the changed circumstances since the filing of the motion warrant a
24   reconsideration and denial" of HIP Lending's Motion.  (*Id.* at 3).  Much of Defendants'
     Motion simply repeats arguments they made in their Response to HIP Lending's Motion
25   and at the Motion Hearing.  Additionally, the evidence regarding Defendants' "changed
     circumstances" was previously detailed in the Joint Supplemental Report (Doc. 36) that the
26   Court directed the parties to file.  In other words, Defendants' Motion asks this Court to
     merely rethink its Order, which is an insufficient basis for reconsideration. *See Leong v.*
27   *Hilton Hotels Corp.*, 689 F. Supp. 1572, 1573 (D. Haw. 1988).  Accordingly, the Court
     will deny Defendants' Motion (Doc. 39).
28
     [2]      The Court notes that HIP Lending has filed a Motion to Dismiss Defendants'
     Counterclaims (Doc. 35), which is not yet fully briefed.  The Court will not address that

1    **I.      BACKGROUND**

2           Plaintiff HIP Lending Group LLC ("HIP Lending") is an Arizona limited liability

3    company and Defendants are part of a corporate family of entities that operate quick service

4    restaurants in Wyoming, Colorado, Illinois, Kentucky, Florida, Georgia, North Carolina,

5    South Carolina, and Louisiana. (Doc. 1 ¶¶ 1, 19).  These restaurants are operated pursuant

6    to franchise agreements with Dog Haus, Church's Chicken, Dairy Queen, and Captain D's.

7    (*Id.* ¶ 19).  Defendant Goalz Restaurant Group, LLC ("GRG") owns membership interests,

8    either directly or indirectly, in Defendants Goalz CD Pooler GA; Goalz Dairy Denver NC,

9    LLC; Goalz Dairy Ft Pierce FL, LLC; Goalz DH Springs CO, LLC; Goalz DH Georgetown

10   KY 111, LLC; Goalz DH IL 107, LLC; Goalz DH IL 109; Goalz DH Slidell LA 112, LLC;

11   Goalz Restaurant Group COWY, LLC; Goalz Restaurant Group FLA, LLC; Goalz

12   Restaurant Group KTY, LLC; and Goalz Restaurant Group NCSC, LLC (collectively the

13   "Subsidiary LLCs").[3]  (*Id.* ¶¶ 20-27).  Additionally, GRG operates as the management

14   company for the Subsidiary LLCs in the operation of the respective quick service restaurant

15   owned by the particular Subsidiary LLC.  (*Id.* ¶ 21).  Defendant Mr. Shawn Eby ("Mr.

16   Eby") is the Chief Executive officer of GRG and each Subsidiary LLC.  (*Id.* ¶ 28).

17          The crux of this lawsuit is that HIP Lending loaned GRG approximately

18   $3,000,000.00 and it has failed to make the required payments.  (*Id.* ¶ 53).  In September

19   2018, the parties entered into a loan agreement ("Loan Agreement") through which HIP

20   Lending loaned GRG $800,000.00 through a series of advances.  (*Id.* ¶ 29; Doc. 27-1[4] at

21   10).  The loan is evidenced by the Promissory Note dated September 4, 2018.  (Doc. 27-1

22   at 36-38).  In connection with the Loan Agreement, GRG granted a security interest in the

23   ────────────────

24   Motion in this Order.

25   [3]      Exhibit A (Doc. 1-3) to the Complaint is a GRG business organization chart that
     depicts the corporate structure and relationship between the corporate Defendants and
26   GRG.

27   [4]      HIP Lending referenced the Loan Agreement in its Complaint and attempted to
     attach a copy of it to the Complaint.  However, HIP Lending inadvertently attached an
28   unexecuted copy of the Loan Agreement as Exhibit B to the Complaint. (Doc. 1-4).
     Accordingly, HIP Lending filed a Notice of Errata and attached an executed copy of the
     Loan Agreement.  (Doc. 27).

following assets whether then owned or subsequently acquired or created:

> All Accounts, Chattel Paper, Goods (including all Inventory, Equipment and Fixtures), Documents, Instruments, General Intangibles (including Payment Intangibles), Investment Property, Letter-of-Credit Rights, Supporting Obligations, Commercial Tort Claims, Other Property, and Borrower's limited liability membership interests in its Subsidiaries; all Proceeds and products of all of the foregoing (including Proceeds of any insurance policies and claims against third parties for loss or any destruction of any of the foregoing); and all Records relating to any of the foregoing.

(the "Collateral") (Doc. 1 ¶ 30; Doc. 27-1 at 12-13). On September 10, 2018, HIP Lending filed UCC-1 Financing Statements to perfect its security interest in the Collateral. (Doc. 1 ¶ 31; Doc. 1-5). Additionally, the Subsidiary LLCs guaranteed the Loan Agreement obligations. (Doc. 1 ¶ 32; Doc. 27-1 at 5, 20-23, 26-28, 30).

In March 2019, the Loan Agreement was amended ("Amended Loan Agreement") to facilitate an additional $1,000,000.00 loan from HIP Lending to GRG. (Doc. 1 ¶ 33; Doc. 27-2 at 10). The additional loan is evidenced by the Secured Promissory Note dated March 14, 2019. (Doc. 27-2 at 42-44). Similar to the Loan Agreement, the Amended Loan Agreement granted HIP Lending a security interest in the Collateral, and HIP Lending again filed UCC-1 Financing Statements to perfect its security interest in the Collateral. (Doc. 1 ¶ 34; Doc. 1-5; Doc. 27-2 at 13). As with the Loan Agreement, the Subsidiary LLCs guaranteed the Amended Loan Agreement obligations. (Doc. 1 ¶ 35; Doc. 27-2 at 5, 21-24, 28-30, 32).

In April 2019, the Amended Loan Agreement was amended for a second time ("Second Amended Loan Agreement") to facilitate an additional loan from HIP Lending to GRG, which raised the total amount of the loan to $3,000,000.00. (Doc. 1 ¶ 36; Doc. 27-3 at 10). The additional loan is evidenced by the Secured Promissory Note dated April 29, 2019. (Doc. 27-3 at 41-43). Similar to the Loan Agreement and the Amended Loan Agreement, the Second Amended Loan Agreement granted HIP Lending a security interest in the Collateral, and HIP Lending again filed UCC-1 Financing Statements to perfect its security interest in the Collateral. (Doc. 1 ¶ 37; Doc. 1-5; Doc. 27-3 at 12-13). As with

the Loan Agreement and the Amended Loan Agreement, the Subsidiary LLCs guaranteed the Second Amended Loan Agreement obligations.  (Doc. 1 ¶ 38; Doc. 27-3 at 5, 20-23, 27-29, 31).  The Second Amended Loan Agreement was to be repaid in thirty-six (36) monthly payments of accrued interest and principal beginning on January 1, 2020.  (Doc. 1 ¶ 40).  Each monthly payment was due on the first of each month until paid in full.  (*Id.*)  The entire principal balance of the loan was due with all interest, fees, and other charges on January 1, 2023, if not otherwise accelerated.  (*Id.*)

Pursuant to the Second Amended Loan Agreement, in the event of GRG's default, GRG shall have five (5) business days following the notice of default to cure such default.  (Doc. 27-3 at 17).  "Events of Default" includes, among other things, a failure to make the required payments.  (*Id.* at 17-18).  Additionally, if GRG fails to cure the Event of Default, HIP Lending is entitled to accelerate and declare immediately due and payable all amounts due under the Second Amended Loan Agreement.  (*Id.* at 19).  The Second Amended Loan Agreement also provides that upon an Event of Default, HIP Lending is entitled to seek the appointment of a receiver.  (*Id.*)  Specifically, the Second Amended Loan Agreement provides, in relevant part:

> Upon or after the occurrence of an Event of Default . . . [HIP Lending] may, in its discretion, petition for and obtain the appointment of a receiver to take possession of any or all of the Collateral and to operate any [GRG and Subsidiary LLCs] business and to exercise such rights and powers as the court appointing such receiver shall confer upon such receiver, [GRG and Subsidiary LLCs] hereby consenting. . . .

(*Id.*)

On March 2, 2020, HIP Lending notified GRG that it was in default for failing to make the required payments under the Second Amended Loan Agreement and provided an opportunity for GRG to cure the default.  (Doc. 1 ¶ 54).  Despite the notice and opportunity to cure, GRG failed to cure the default.  (*Id.* ¶ 56).  On March 10, 2020, HIP Lending notified GRG that it was accelerating the loan and demanded payment for the total amounts due under the Second Amended Loan Agreement.  (*Id.* ¶ 57).

As of March 9, 2020, GRG and the Subsidiary LLCs were obligated to HIP Lending in the amount of $3,377,869.48, which represents outstanding principal and accrued

interest.  (*Id.*)  In addition, HIP Lending asserts that GRG and the Subsidiary LLCs are delinquent in payments to other vendors for certain expenses incurred in the daily operation of the restaurants and, in addition to the amount owed to HIP Lending, have outstanding payables in excess of $1,000,000.00.  (*Id.* ¶¶ 42-52).  Specifically, HIP Lending asserts that GRG has received disconnect notices from various utilities for non-payment and has received default notices from several landlords.[5]  Additionally, HIP Lending alleges that Defendants are in default of several of the franchise agreements.  (*Id.*)

On March 16, 2020, HIP Lending filed its Complaint, alleging the following claims for relief: (1) Breach of Contract, (2) Unjust Enrichment, (3) Breach of Implied Covenant of Good Faith and Fair Dealing, and (4) Breach of Guaranty.  (Doc. 1).  Defendants filed their Answer on April 22, 2020.  (Doc. 25).  Defendants also filed a Motion to Dismiss (Doc. 24), which the Court previously denied.  (Doc. 33).  HIP Lending filed the pending Motion for the Appointment of Receiver (Doc. 4).  The Court held a hearing on the Motion on May 12, 2020 and granted the Motion.

## II.    LEGAL STANDARD

The appointment of a receiver in a diversity case is governed by federal law and federal equitable principles.  *See New York Life Ins. Co. v. Watt West Inv. Corp.*, 755 F. Supp. 287, 290–92 (E.D. Cal. 1991).  "Under federal law, appointing a 'receiver is an extraordinary equitable remedy,' which should be applied with caution." *Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837, 844 (9th Cir. 2009) (quoting *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc*., 999 F.2d 314, 316 (8th Cir. 1993)). In federal court, a motion to appoint a receiver is governed by Federal Rule of Civil Procedure ("Rule") 66, which provides that "the practice in administering an estate by a receiver or a similar court-

---

[5]    Defendants provide that they received a Small Business Administration ("SBA") loan pursuant to the Payroll Protection Program ("PPP") provision of the Coronavirus Aid, Relief, and Economic Security Act of 2020 ("CARES Act").  (Doc. 39 at 4).  As a result of that loan, Defendants provide they "are [now] current on rent obligations with all landlords."  (*Id.*)  While Defendants claim that all of these funds will be "forgiven," Defendants are not in a position to make such guarantees.  Whether all or part of the PPP loan is forgiven is a decision by the U.S. Treasury Department and SBA, not Defendants. In other words, it is not a forgone conclusion that the PPP loan will be forgiven. However, for the purposes of this Order, the Court will assume that Defendants are current on all rent obligations.

appointed officer must accord with the historical practice in federal courts or with a local rule." Requiring courts to adhere to the "normative standard" of historical practice in federal courts ensures uniform appointment of receivers. *Canada Life*, 563 F.3d at 842.

Although historical practice has not yielded a precise formula for the appointment of a receiver, court decisions have created a group of factors that a court should consider when deciding whether to appoint a receiver. *Id.* at 844. Factors that courts consider include:

> (1) whether the party seeking the appointment has a valid claim; (2) whether there is fraudulent conduct or the probability of fraudulent conduct, by the defendant; (3) whether the property is in imminent danger of being lost, concealed, injured, diminished in value, or squandered; (4) whether legal remedies are inadequate; (5) whether the harm to plaintiff by denial of the appointment would outweigh injury to the party opposing appointment; (6) the plaintiff's probable success in the action and the possibility of irreparable injury to plaintiff's interest in the property; and, (7) whether the plaintiff's interests sought to be protected will in fact be well-served by receivership.

*Id.* (internal quotation and citation omitted).

The Ninth Circuit has also previously applied factors such as "whether the defendant was of doubtful financial standing" and "whether the property was of insufficient value to insure payment." *Canada Life*, 563 F.3d at 844. Evidence of only these two "previously applied" factors may be sufficient to appoint a receiver to collect rents or other revenue from the subject property, but they alone are not sufficient to vest the receiver with managerial powers; "something more" is also required for appointment of a receiver with the added power to manage the property. *Id.* at 845 (quoting *View Crest*, 281 F.2d at 847). This difference is material, because the grant of managerial powers, unlike the authority to collect rents, effectively divests the property owner of rights traditionally exercised by an owner. *See Sterling Sav. Bank v. Citadel Dev. Co, Inc.*, 656 F. Supp. 2d 1248, 1261 (D. Or. 2009). The additional requirement for managerial receivers may be evidence indicating the risk of economic waste, foreclosure delays, or any other factor that compels appointment of a receiver. *Canada Life*, 563 F.3d at 845 (citing *View Crest*, 281 F.2d at 847). Ultimately, the court has broad discretion in determining whether to appoint a

1  receiver.  *See, e.g.*, *Canada Life*, 563 F.3d at 845.

2  **III.   DISCUSSION**

3        HIP Lending requests a receiver with broad managerial powers.  (Doc. 4-3).  HIP

4  Lending argues that the Court should appoint a receiver because: (1) GRG and the

5  Subsidiary LLCs consented to the appointment of a receiver in the Second Amended Loan

6  Agreement, (2) GRG and the Subsidiary LLCs are in a dubious financial position, and (3)

7  the traditional equitable factors support the appointment of a receiver.   (Doc. 4).

8  Defendants, however, argue that a receivership is inappropriate because: (1) "[HIP

9  Lending's] principal is a fifteen percent (15%) owner of the Defendants"[6] and therefore

10 HIP Lending has a conflict of interest, and (2) the traditional factors for evaluating the

11 propriety of receivership do not favor the appointment of a receiver.[7]  (Doc. 26 at 2).

12       **A.     The Effect of Contractual Consent to Appoint a Receiver**

13       While consent is a factor that commands great weight, it alone is not dispositive of

14 _____

15 [6]      Defendants have failed to offer evidence of a conflict of interest, in part, because as
   discussed at the Motion Hearing, HIP Lending is not a fifteen percent owner of Defendants.
16 Rather, RCH-Goalz Holdings, LLC holds a fifteen percent interest in Defendants.  (Doc.
   26 at 4).   RCH-Goalz Holding is managed by Hannay Investment Properties, Inc. and
17 owned by RCH Investment Company, LLC. RCH Investment Company is also managed
   by Hannay Investment Properties and owned by the Robert Craig Hannay Irrevocable Trust
18 and the R Craig Hannay Trust.
         Hannay Investment Properties has one shareholder, Mr. R. Craig Hannay ("Mr.
19 Hannay"), who is also a Director, the President, and the CEO of Hannay Investment
   Properties.  Additionally, John Reid Bracken is a Director and the Vice-President, Mary C.
20 Hislop is a Director and the Treasurer, and Tamara A. Hartrick is the Secretary of Hannay
   Investment Properties.
21       HIP Lending is owned by HIPCO Office Investments, LLC and the Hannay Family
   Trust (Doc. 2) and is also managed by Hannay Investments Properties.  HIPCO Office
22 Investments is also managed by Hannay Investments Properties and owned by RCH
   Investment Company, RJH Investments LLP, and the Carrie Russel Trust.
23       In other words, HIP Lending and RCH-Goalz are both managed by Hannay
   Investment Properties; however, their ownership structures are different, although there is
24 clearly some overlap.  Moreover, HIP Lending argued, and Defendants did not dispute,
   that the loan agreements at issue here were all arm's length transactions. Accordingly, the
25 Court finds that while the ownership of HIP Lending and RCH-Goalz Holdings is
   convoluted and Mr. Hannay clearly has a prominent role in both, Defendants have not put
26 forth evidence to support their "conflict of interest" argument.

27 [7]      Defendants also argue that HIP Lending's claims are barred by the statute of frauds,
   and therefore there are serious questions regarding the merits of HIP Lending's claims.
28 (Doc. 26 at 1).  The Court already denied Defendant's Motion to Dismiss premised on the
   same statute of frauds argument.  (Doc. 33).  Accordingly, the Court will not address that
   argument again in this Order.

whether to appoint a receiver. *Sterling Sav. Bank v. Citadel Dev. Co., Inc*., 656 F. Supp. 2d 1248, 1260-61 (D. Or. 2009) (collecting authorities and concluding that contractual consent is not automatically dispositive of federal receivership analysis, but it is an equitable factor that commands great weight). Additionally, courts have distinguished between the type and scope of the consent. *Id.* ("Consent to the mere *application* to a court to appoint a receiver may be materially different from consent to the *actual appointment* of a receiver.") (emphasis added). Defendants have not only consented to the application to appoint a receiver but have also consented to HIP Lending "obtain[ing] the appointment of a receiver . . . ." (Doc. 27-3 at 19). Moreover, Defendants consented to the "appointment of a receiver to take *possession* of any or all of the Collateral and to *operate* any [GRG and Subsidiary LLCs] business. . . ." *Id.* In other words, Defendants have consented to the appointment of a receiver with broad managerial powers. Additionally, Defendants have not argued that the consent provision of the Second Amended Loan Agreement is invalid or otherwise unenforceable. Thus, Defendants' alleged consent to the appointment of a receiver greatly weighs in HIP Lending's favor, but it does not require appointment. *See Sterling Sav. Bank*, 656 F. Supp. 2d at 1261 (noting consent "commands great weight" and should be considered "in addition to weighing the federal receivership factors espoused in *Canada Life*").

**B.     Weighing the *Canada Life* Receivership Factors**

The Court's analysis of the *Canada Life* receivership factors begins with the two "previously applied" factors. The first "previously applied" factor is whether Defendants are of doubtful financial standing. *Canada Life*, 563 F.3d at 844. In their briefing and during the Motion Hearing, HIP Lending provided evidence—which Defendants did not dispute—that Defendants are in default from third-party vendors that are unrelated to HIP Lending. (Doc. 1-12; Doc. 1-13; Doc. 28-2). Specifically, several of the Subsidiary LLCs are franchisees that, pursuant to the franchise agreements, are in default, and in some cases, termination of the franchise agreement may be imminent. (Doc. 1-10; Doc. 1-11). Moreover, Defendants do not dispute that they have failed to make the required payments

1   under the Second Amended Loan Agreement.  Defendants concede that they have been

2   juggling payables and have struggled to pay daily operational expenses. While the Court

3   appreciates the current Coronavirus pandemic has certainly worsened Defendants'

4   financial position, the Court notes that Defendants' financial instability began long before

5   the pandemic took hold.   Defendants appear unable to mange their mounting debts in a

6   way that protects all of the creditors, including HIP Lending.

7          The parties notified the Court that Defendants are in the process of selling several

8   Subsidiary LLCs "[e]ssentially, in exchange for forgiveness of back rent, late charges,

9   interest, fees, and all liability (including guaranties) under leases at those locations . . . ."

10  (Doc. 36 at 5).  Defendants estimate that this transaction would alleviate about $400,000.00

11  in debt from GRG's books.  (*Id.*)  Defendants also provide that they are in negotiations to

12  sell three other Subsidiary LLCs and "[i]t is anticipated that these sales would be for cash

13  rather than forgiveness of landlord obligations."[8]     (*Id.*; Doc. 39 at 5).   Additionally,

14  Defendants have received a $687,900.00 Small Business Administration loan[9] pursuant to

15  the Payroll Protection Program ("PPP") provision of the Coronavirus Aid, Relief, and

16  Economic Security Act of 2020 ("CARES Act").[10]   (Doc. 36 at 2).   While the Court

17  recognizes that these transactions may alleviate some of the financial hardship Defendants

18  are experiencing, the Court does not find that they would put Defendants in a position that

19  would weigh against the appointment of a receiver.  In conclusion, the Court finds that

20  evidence put forth supports the inference that Defendants are of doubtful financial standing.

21  Thus, this factor weighs in favor of appointing a receiver.

22         The second "previously applied" factor is whether the Collateral's value is

---

23  [8]    Defendants provide that the sale of the three restaurants reduces the outstanding rent
24  obligations by approximately $556,162.20.  (Doc. 39 at 5).

25  [9]    Defendants provide in their Motion for Reconsideration that they received a PPP
    loan of $1,124,000.00; however, this is inaccurate.  (Doc. 39 at 2).  As noted in the Joint
26  Status Report, the PPP loan received included approximately $436,100.00 that was
    allocated to an entity that is not a party to this litigation or subject to the receivership.  (Doc.
27  36 at 2).  Accordingly, only $687,900.00 was allocated to Defendants.

28  [10]    As previously discussed, despite Defendants' arguments to the contrary, the PPP
    loan is not automatically forgiven, and therefore, the Court will not treat it as so in this
    Order.

insufficient for the debt it secures. *Canada Life*, 563 F.3d at 844. HIP Lending has submitted evidence that as of March 9, 2020, Defendants owe a principal balance of $3,000,000.00, as well as $377,869.48 in interest. (Doc. 4-1 at 7). Moreover, Defendants have conceded that they have not made any payments on the outstanding loan amount. Defendants argue that the total value of the Collateral is $9,200,000.00; however, the authenticity of the "evidence" (Doc. 26-1) supporting Defendants' valuation is in dispute. (*Compare* Doc. 26 at 4, *with* Doc. 28-2 at 2-3). Furthermore, Defendants have not provided sufficient information to allow the Court to weigh the credibility of this "evidence" and the facts and figures contained therein. Additionally, in addition to the outstanding loan to HIP Lending, the parties provide that as of May 15, 2020, Defendants' "records reflect payables in excess of $2,000,000 relating to their operations[,] [m]any of [which] are in excess of sixty days overdue." (Doc. 36 at 4). In other words, Defendants' debt at least exceeds $5,000,000.00, and, given that default interest continues to accrue daily on the balance due on the loans, is growing by the day. Moreover, Defendants provided no assurances they will soon be in a position to fully repay the amounts owed. Thus, although the record before the Court does not support a conclusive finding that the Collateral's value is insufficient for the debt it secures, HIP Lending has offered evidence that indicates that the security is likely inadequate. Accordingly, the Court finds this factor favors the appointment of a receiver.

Moving to the *Canada Life* enumerated factors, the Court will first consider whether HIP Lending has a valid claim. The Court has not had the benefit of a trial or of hearing all the evidence that bears on HIP Lending's claims; however, HIP Lending has submitted evidence that Defendants GRG have defaulted on the Second Amended Loan Agreement with an outstanding balance, including interest, of over $3,000,000.00. (Doc. 4-1 at 7). Moreover, Defendants have not offered any evidence to dispute the allegation of default and conceded at the Motion Hearing that they had yet to make any payments on the outstanding loan. Thus, HIP Lending has presented evidence sufficient to prove the validity of its claims, and this factor weighs in favor of appointing a receiver.

The second enumerated factor is whether HIP Lending has presented evidence of "fraudulent conduct or the probability of fraudulent conduct, by the defendant." *Canada Life*, 563 F.3d at 844. HIP Lending has not alleged any fraud or misrepresentation by Defendants. In fact, HIP Lending conceded during the Motion Hearing that, while there is a myriad of management issues, at this time there are no allegations that any of those management issue rise to the level of fraud. Therefore, this factor weighs against the appointment of a receiver at the present time.

The third enumerated factor is whether HIP Lending has submitted sufficient evidence to show that "the property is in imminent danger of being lost, concealed, injured, diminished in value, or squandered." *Id*. HIP Lending has provided substantial evidence indicating that Defendants are delinquent in paying substantial debts incurred by daily operations, such as utility payments.[11] If the utilities are terminated, those restaurants will cease to operate and will be unable to generate revenue, further decreasing the value of the Collateral. Moreover, as much of the value of the Collateral is intimately tied to continued operation under the franchise agreements, the evidence that several of the Subsidiary LLCs are in default of their franchise agreements[12] indicates that the Collateral is in imminent danger of being diminished. *See U.S. Bank Nat'l Ass'n v. Nesbitt Bellevue Prop. LLC*, 866 F. Supp. 2d 247, 250–51 (S.D.N.Y. 2012) (allowing the appointment of a receiver because the properties at issue faced an "inexorable" diminution in value based on the imminent loss of a franchise license). Accordingly, this factor weighs in favor of appointing a receiver.

---

[11]    While Defendants provide that PPP loans can be used for utility obligations, they fail to mention whether they are in fact current on their utility obligations. (Doc. 39 at 2).

[12]    In August 2019, one of the Subsidiary LLCs that operates a Church's Chicken pursuant to a franchise agreement narrowly avoided termination of the franchise agreement by entering into a promissory note with the franchisor. (Doc. 1 ¶ 45; Doc. 1-9). A provision of that promissory note provides that any default thereunder is a default upon all franchise agreements with the franchisor. In early March 2020, GRG failed to make the required payments under the promissory note and is therefore in default. (Doc. 1-10). In other words, pursuant to the terms of the promissory note, all of the Subsidiary LLCs operating pursuant to a Church's Chicken franchise agreement are in danger of their franchise agreements being terminated.

The fourth enumerated *Canada Life* factor is whether HIP Lending's legal remedy, foreclosure, which is the typical remedy for nonpayment and breach of loan obligations, is inadequate.  *Canada Life*, 563 F.3d at 844.  Although GRG manages all of the Subsidiary LLCs, each Subsidiary LLC is effectively a single quick service restaurant—located in a multitude of states, including North Carolina, South Carolina, Georgia, Wyoming, and Illinois—that operates pursuant to a franchise agreement.  Thus, foreclosure is neither simple nor quick enough to protect the Collateral from serious diminution.  Accordingly, HIP Lending argues that its legal remedies are inadequate because, absent the appointment of a receiver to manage the Collateral and prevent its value from being adversely affected, the Collateral will likely be inadequate to secure the value of the loan.  The evidence indicates that it is unlikely that Defendants might soon become able to fully repay the amounts owed on their loan.  Moreover, as the Court has already noted, given the deteriorating nature[13] of the Defendants' financial situation, the threatened termination of franchise agreements, and looming utility disconnections, the Collateral is in imminent danger of being diminished.  Accordingly, the Court finds that given the tenuous position of the collateral and time-consuming nature of foreclosure given the fact that the restaurants operated by the Subsidiary LLCs are located in several different states, HIP Lending's legal remedies are inadequate.  Accordingly, this factor weighs in favor of appointing a receiver.

The fifth enumerated *Canada Life* factor is "whether the harm to plaintiff by denial of the appointment would outweigh injury to the party opposing appointment."  *Canada Life*, 563 F.3d at 844.  HIP Lending argues that "Defendants are staring into the abyss with

---

[13]     Defendants argue that as of late their "performance has been outstandingly better than during the coronavirus shutdowns in early March through mid to-late April. . . . These are wholesale improvements in performance, 52.44% to be exact."  (Doc. 39 at 7).  Defendants further provide "the boon [sic] of the CARES's Act PPP loan, all of which will be forgiven, is expected to ignite the Defendants' recovery and ability to pay HIP [Lending]."  (*Id.*)  While the Court appreciates that there appears to be some improvements, Defendants appear to fail to recognize that the 52.44 percent increase in only an increase in *revenue*; it does not account for expenses.  Moreover, it is calculated using the lowest performing week during the deepest impact of the pandemic at each location as a baseline.  (Doc. 36 at 3).  Additionally, Defendants are asking this Court to rely on their "expectations" without providing a plan for financial recovery.  Accordingly, despite Defendants' contentions, there is little evidence to suggest that Defendants are in a stable financial position.

landlords, franchisors, and other creditors starting the process to collect on their claims[,]" and "the appointment of a receiver who will take possession of the Collateral and protect it from forfeiture and dissipation will actually provide value to the Defendants." (Doc. 4 at 10). Defendants, however, contend that they "may be headed over a cliff, like most restaurants these days [and] [t]he last thing they need is someone who has never set foot behind the counter in a franchise telling them how to run things." (Doc. 26 at 9-10). Defendants further argued at the Motion hearing that, left to their own devices and based upon Mr. Eby's "entrepreneurship," they can stabilize their finances. While the Court appreciates that Mr. Eby is an entrepreneur, Defendants failed to provide any evidence that they have a strategy or plan to regain control of their financial situation. Rather, they appear to rely on an ad hoc strategy of hoping they will have a "good weekend" that will cause a spike in revenue that will be sufficient to catch up on their outstanding obligations. This is an inadequate business plan given Defendants' current finical situation. A receiver with experience in turnaround consulting will likely have the skills necessary, and a more coherent strategy, for regaining control of Defendants' finances. In light of Defendants' lack of coherent strategy and the deteriorating nature of their financial situation, the Court finds that the harm to HIP Lending by denying of the appointment outweighs the injury to Defendants. Therefore, this factor weighs in favor of appointing a receiver.

The sixth enumerated factor in *Canada Life* is "the plaintiff's probable success in the action and the possibility of irreparable injury to plaintiff's interest in the property." *Canada Life*, 563 F.3d at 844. As previously discussed, Defendants do not dispute that they are in default. Accordingly, based on the evidence before the Court, HIP Lending's probability of success on the merits of the claims alleged in the Complaint appears high. Moreover, as previously discussed, the Collateral is in imminent danger of being diminished. Accordingly, this factor weighs in favor of appointing a receiver.

The seventh and final enumerated factor in *Canada Life* is whether HIP Lending has submitted sufficient evidence to show that its "interests sought to be protected will in fact be well-served by receivership." *Canada Life*, 563 F.3d at 844. Appointing a receiver

will allow an independent entity to manage the Collateral and review expenses, including salaries,[14] while the claims are adjudicated, which is in HIP Lending's interest.  Thus, this factor weighs in favor of appointing a receiver.

After considering each of the enumerated and the "previously applied" *Canada Life* factors individually and weighing them in the aggregate and considering Defendants' consent to a receiver in the Second Amended Loan Agreement, the Court concludes that HIP Lending has shown that appointment of a receiver is necessary and appropriate. Moreover, given the circumstances and the fact that Defendants consented to a managerial receivership, the Court finds that a managerial receivership is necessary.  Therefore, HIP Lending's Motion for the Appointment of Receiver is granted.

### C.   Proposed Receiver

HIP Lending initially proposed the appointment of "GlassRatner Advisory & Capital Group, LLC, by and through Bill Hughes" as the receiver.  (Doc. 4-3).   HIP Lending further provided that Mr. Hughes is "a C.P.A. with considerable experience as a receiver, chief restructuring officer, and chapter 11 trustee." (Doc. 4 at 12).  Defendants, however, contend that Mr. Hughes is an inappropriate receiver because he has no experience with franchises or restaurants. (Doc. 26 at 9).  At the Motion hearing, the Court expressed concerns with proposal of Mr. Hughes and GlassRatner due to the lack of experience in the restaurant industry.  Accordingly, the Court permitted HIP Lending to provide supplemental support for GlassRatner and Mr. Hughes, which it did provide. Additionally, the Court instructed the parties to confer in good faith and jointly provide a proposed receiver.  However, if the parties were unable to agree on a proposed receiver,

---

[14]    HIP Lending alleges that "in February 2020, Defendants, at Mr. Eby's direction, increased Mr. Eby's wife's salary from $50,000 to $75,000 despite consistent shortfalls in making payroll and payment of other expenses."  (Doc. 4 at 6).  At the Motion Hearing, Defendants countered that the increase in salary was because Mr. Eby's wife took on more responsibility. The Court does not find that the increase in salary is necessarily inappropriate; however, the Court is skeptical that an increase in compensation in February 2020 was prudent when on March 5, 2020, Defendants received a Notice of Default from one of its franchisors for failing to make the required payments under a promissory note. (Doc. 1-10 at 2).  In other words, the Court finds an independent entity will be beneficial to review Defendants' expenses.

1    each party could provide the Court with one proposed receiver.  Plaintiff complied with

2    the Court's direction and nominated Ankura Consulting Group, LLC ("Ankura"), by and

3    through, its Senior Managing Director P. Gregg.  (Doc. 38).  Defendants, however, failed

4    to propose a receiver.[15]

5           HIP Lending provides that GlassRatner has substantial experience with franchised

6    restaurants and has assisted franchisors, franchisees, and creditors of franchisees in a

7    variety of matters and roles.  (Doc. 37 at 2).  While Mr. Hughes "has not served as a receiver

8    for restaurants"; HIP Lending contends that "numerous other individuals within

9    [GlassRatner] are qualified to serve" as receiver.  (*Id.*)  Specifically, in its supplemental

10   support, HIP Lending provides that Mr. Joseph Pegnia, a Senior Managing Director at

11   GlassRatner, has restaurant industry experience with numerous franchisees and

12   franchisors, including the sale of restaurants.  (Doc. 37 at 3).  Additionally, HIP Lending

13   provides that Mr. Pegnia has substantial experience overseeing the operations of more than

14   150 franchised restaurants.  (*Id.*)  The Court has considered all proposed receiver and finds

15   that the appointment of Mr. Pegnia is best suited as a receiver here and will likely do more

16   good than harm.  Mr. Pegnia has impressive professional credentials and experience in

17   areas relevant to Defendants' business, including restaurants and franchises.  Moreover,

18   the Court is not persuaded that "Defendants' financial performance since the depths of the

19   coronavirus-related shutdowns have been nothing short of remarkable."  (Doc. 39 at 4).

20   The record shows that Defendants have not managed the restaurants so as to protect HIP

21   Lending's interests.  Insofar as the receiver requires any specialized knowledge that Mr.

22   Eby alone possesses, the receiver can solicit input from Mr. Eby and the Court expects Mr.

23   Eby to be cooperative.

24   **IV.    CONCLUSION**

25          To be sure, the appointment of a receiver is an "extraordinary equitable remedy . . ."

26   

27   [15]    Defendants maintain that they are in the best position to operate and manage the businesses and expressed their dissatisfaction with HIP Lending's proposed receivers in

28   their Motion for Reconsideration (Docs. 39, 39-1); however, as discussed in this Order, the Court disagrees.

*Canada Life*, 563 F.3d at 844 (internal quotation and citation omitted).  But, the parties bargained for precisely this remedy upon default when they entered into the loan agreements.  Moreover, Defendants have not suggested, nor can the Court conceive, of a less drastic equitable remedy[16] that would afford the same protection to HIP Lending's interests.  Therefore, the Court will grant HIP Lending's Motion for the Appointment of a Receiver.  Additionally, the Court finds that Mr. Pegnia is an appropriate receiver.  Accordingly,

IT IS ORDERED that HIP Lending's Motion for the Appointment of Receiver (Doc. 4) is **GRANTED**.

IT IS FURTHER ORDERED that Defendants' Motion for Reconsideration (Doc. 39) is **DENIED**.

IT IS FINALLY ORDERED as follows:

1.      **Appointment of Receiver**.  GlassRatner Advisory & Capital Group, LLC, by and through Mr. Joseph Pegnia (the "Receiver"), is appointed Receiver over the Collateral and Subsidiary LLCs (the "Receivership Estate"). The Court finds that the Receiver possesses the necessary qualifications to act as receiver for the Receivership Estate.

2.      **Bond and Oath.**  The Receiver's appointment is effective upon the Receiver filing a bond with the Clerk of the Court in the amount of $10,000.00 and taking the oath required by law.   The cost of the bond will be reimbursed to the Receiver by the Receivership Estate.  The Receiver may at any time file a motion requesting that the bond be exonerated, or that it be discharged or released from its appointment as receiver, and all of its responsibilities attendant thereto.

---

[16]      Both parties have put forth proposed orders regarding the scope of the receivership. (Docs. 4-3 & 39-2).  Defendants' proposed order provides that the receiver "will occupy an oversight position, rather than a hands-on intensive management role."  (Doc. 39 at 8). The Court finds that an "oversight position" would not be enough to accomplish the purpose of the receivership.  Moreover, as previously discussed, Defendants consented to a managerial receivership in the Second Amended Loan Agreement.

3.     **Powers and Duties.**   The Receiver shall have exclusive possession and control over the Receivership Estate with the power and authority to take possession, preserve, protect, operate, manage, market, sell and transfer the Receivership Estate and/or any parts or portions thereof.  The Receiver shall be the agent of this Court and solely the agent of this Court in acting as the Receiver under this Order. The Receiver shall be accountable directly to this Court.  The Receiver shall comply with all laws and Local Rules of this Court governing federal receivers. The Receiver shall have other powers, rights and duties of receivers appointed under federal law including, without limitation, the following rights, powers and duties:

A.     **Collection of Proceeds.**   The Receiver shall have the power to take all steps necessary to collect the Proceeds from the Receivership Estate and deposit said sums into one or more accounts ("Bank Account") at a federally insured bank.   The Receiver shall have the power to present for payment any checks, money orders, and other forms of payment made payable to Defendants or Subsidiary LLCs, any property manager, any affiliates of any of them, or such similar names, which constitute or are derived from the Proceeds of the Receivership Estate, endorse same and collect the proceeds thereof, such proceeds to be used and maintained as elsewhere provided herein.  The Receiver shall have the sole and exclusive authority to disburse funds from the Bank Account.  The Receiver shall have authority to take possession of bank and other deposit accounts of Defendants or Subsidiary LLCs, any property manager or any affiliates of any of them related to the Receivership Estate, including such accounts that may not be in Defendants' or Subsidiary LLCs' name, or that may be in the name of one or more management companies, and to open, transfer and change all bank and trade accounts relating to the Receivership Estate, so that all such accounts are in the name of the Receiver.

B.     **Possession of Receivership Estate.**   The Receiver shall have the exclusive right to take and keep possession of the Receivership Estate, including, without limitation, all bank accounts, security deposits, and deposit accounts during the pendency

of the receivership and/or the above-captioned action.  The Receiver is authorized to engage a lock smith or similar professional for the purposes of gaining access and taking possession of any asset of the Receivership Estate.

C.   **Management of Receivership Estate.**  The Receiver shall manage and operate the Receivership Estate on a daily basis in a manner consistent with this Order. The Receiver shall have the power and authority to enforce agreements and enter into new agreements and contracts relating to the Receivership Estate.  The Receiver shall manage, operate and maintain the Receivership Estate subject to such rules and conditions as the Receiver may establish to ensure that Profits are profitably preserved and used, and to reasonably ensure that the value of the Receivership Estate is not materially diminished. The Receiver shall make the following daily operating decisions regarding the Receivership Estate, including, without limitation:

1)    Hire outside advisors for the Receivership Estate to conduct the operations of the Receivership Estate as directed by Receiver, and terminating the employment of existing advisors, officers, or employees of the Receivership Estate, in its discretion;

2)    Providing maintenance, repair, and improvement services for the Receivership Estate and extraordinary maintenance or repair services where deemed appropriate in connection with emergency conditions; provided, however, that the Receiver shall not contract for extraordinary maintenance or repair services costing $5,000 or more without approval of the Court;

3)    Terminating or continuing in effect in Receiver's business judgment any contracts or leases presently existing relating to the Receivership Estate;

4)    Entering into or modifying contracts affecting any part or all of the Receivership Estate, including, without limitation, any leases affecting the Receivership Estate, so long as, for all contracts costing or having a value of more

than $10,000 annually, or for any leases or contracts having a term of more than 30 days, the Receiver first obtains the written consent of the Court; and

        5)    Procuring goods and services for the Receivership Estate.

    D.    **Sale or Liquidation**.  The Receiver may hire brokers for the Receivership Estate as the Receiver deems appropriate to assist with listing and marketing the Receivership Estate for sale. The Receiver, with Court approval, may sell the Receivership Estate, in part or in whole, free and clear of liens, claims, encumbrances, and interests.  If the Receiver decides to proceed with a sale of some or all of the Receivership Estate, the Receiver or Plaintiff shall file a Motion to Approve a sale and any party shall have fourteen (14) days to file an objection with this Court.  If no timely objection is filed, then the Receiver or Plaintiff shall file a Notice of No Objection and the Motion will be considered fully briefed at that time.  If a timely objection is received, the Court will at that time determine whether it needs to set a hearing on the Motion and Objection.

    E.    **Payment of Expenses.**  To the extent reasonably possible given the income generated by the Receivership Estate, the Receiver shall pay the current operating expenses of the Receivership Estate in the ordinary course of business; provided, however, that the Receiver shall not pay operating expenses or other payables relating to periods prior to Receiver's appointment as the Receiver unless, in Receiver's discretion, the same is necessary or desirable for the current and future operation and management of the Receivership Estate.  The Receiver shall also disburse funds from the Bank Account to pay all amounts necessary to maintain adequate all risk hazard property damage and all risk comprehensive liability insurance on the Receivership Estate, to the extent necessary to ensure the Receivership Estate is insured (nothing herein shall be deemed to absolve Defendants of their obligations under the Loan Documents in place between Plaintiff and Defendants).  Subject to the provisions of this Order, payment of payroll, payroll taxes, employee benefits, leasing company fees, property management company fees, as

applicable, utilities, insurance, taxes, landscaping, janitorial services, and maintenance and other ordinary course expenses shall not require prior approval of the Court.

F. **Accounting Records.** Defendants shall cause to be provided, on reasonable notice and during normal operating hours, and the Receiver shall expeditiously review and inspect the accounting records with respect to the Receivership Estate, and shall take such steps as it deems necessary to assure that all Profits collected and all the disbursements made in connection with the Receivership Estate by the Receiver are properly accounted for in accordance with generally accepted accounting principles.

G. **No Obligation to Complete Tax Returns.** Notwithstanding any other provision hereof, the Receiver shall be under no obligation to complete or file tax returns on behalf of Defendants or Subsidiary LLCs for income or other taxes. While acting as receiver, the Receiver shall comply with applicable laws and regulations relating to the collection of taxes. The Receiver shall allow Defendants or Subsidiary LLCs with such access to books and records within the Receiver's custody or control as may be necessary in order for Defendants or Subsidiary LLCs to complete and file tax returns on their own behalf.

H. **No Appraisal Required.** The Receiver is excused from seeking an independent professional appraisal of the Receivership Estate, but the Receiver is authorized to commission appraisals at the Receiver's discretion.

I. **Standard of Care.** The Receiver shall at all times exercise reasonable care in employing its business judgment to administer the Receivership Estate.

J. **Licenses and Permits.** The Receiver may acquire or renew all governmental licenses, permits, or other authorizations, including any liquor license, either in the Receiver's name or in the name of Defendants or Subsidiary LLCs, pertaining to the Receivership Estate or any business associated therewith and do all other things necessary or appropriate to maintain and protect the Receivership Estate.

K. **Budget and Actual-to-Budget Comparison Reports**. The Receiver shall be permitted to use Advances and Proceeds only as set forth in and pursuant to a Budget and this Order. All Advances and Proceeds shall be deposited into the Bank Accounts as set forth above, which shall be disbursed by the Receiver pursuant to the express items in the Budget. The Receiver shall prepare and submit to the parties and the Court a detailed budget ("Budget") that sets forth all projected receipts together with a weekly forecast of other revenues and expenses and available cash. Any party may file an objection within seven (14) days, which must specifically identify the category or line item that it is objecting to and propose an alternative amount. If no party files a timely objection, the budget shall be deemed approved. On a weekly basis the Receiver shall prepare and submit to the parties and the Court an actual-to-budget comparison report. The Budget may be amended from time to time with prior Court approval.

L. **Borrowing Authority.** The Receiver is authorized to borrow from Plaintiff, with Court approval, such amounts as may be necessary to satisfy the costs and expenses of the receivership, to pay operating expenses and other expenses, to the extent that the net Proceeds derived from the Receivership Estate are insufficient to satisfy such costs and expenses ("Advances"). All borrowings from Plaintiff shall be added to the principal as Advances under the Loan Documents between Plaintiff and Defendants and shall be secured by the Loan Documents with the same priority as Plaintiff's existing liens encumbering the Receivership Estate. The Advances shall be repaid by the Receiver to Plaintiff as collection of Proceeds allow or from the proceeds of the sale of the assets of the Receivership Estate.

4. **Administration.** The Receiver is authorized to employ the following procedures and case administration:

A. **Bank Accounts.** The Receiver may establish the Bank Accounts described above.

B.   **Financial Reports.**   Commencing sixty (60) days after the appointment herein, and no later than the fifteenth (15th) day of each month thereafter, the Receiver shall file with the Court and serve on the parties a complete report on its activities and the condition of the Receivership Estate during the preceding calendar month, including a complete accounting of Proceeds collected and the disbursements made during the preceding calendar month (the "Report").  If the Receiver believes such Report would contain sensitive financial information, disclosure of which will negatively impact the Receivership Estate or the Receiver's ability to sell the Receivership Estate, the Receiver may request, in compliance with Local Rule 5.6, to file the Report under seal.

C.   **Fee.**   The Receiver, including its staff professionals, shall be paid a reasonable customary fee for its work as receiver based upon its normal hourly rates.  The Receiver shall file with the Court and serve on the parties' periodic requests for the payment of such reasonable compensation, with the first such request filed no more than sixty (60) days after the date of this Order. Any party shall have fourteen (14) days after the Receiver files the request with the Court to object to the requested fees and costs.  The approved fees and costs of the Receiver and its professionals, including retained counsel, shall be paid from the gross receipts derived from the Receivership Estate.  If the assets are not sufficient to pay the approved Receiver's fees as presented, Plaintiff may, with Court approval, and without obligation to do so, advance funds to the Receiver sufficient to pay such approved fees and costs, which funds shall constitute Advances under the Loan Documents.

D.   **Court Approval; Procedure.**   Any motion by the Receiver for Court approval or any act of the Receiver requiring Court approval shall be served on each party hereto and each other person who has filed and served on the Receiver a request for special notice.  The Receiver may file requests for special notice on behalf of any party; however, such request filed by the Receiver shall not be deemed consent to the jurisdiction of this

Court.  In addition to service by mail or personal service, service may be made by facsimile or e-mail.

E.  **Notice.**  In addition to any special notice provisions contained herein, the Receiver shall provide notice of all pleadings filed by the Receiver herein to the parties hereto.  Unless otherwise provided by the Rules of Civil Procedure, such notice may be made by mail or personal service five (5) days in advance of any hearing, by confirmed facsimile five (5) days in advance of any hearing, or as otherwise may be approved by the Court.  The Receiver shall be deemed to have been provided adequate notice if it complies with this section.

F.  **Further Instructions.**  The Receiver may at any time apply to this Court for further or other instructions or for modification of this Order or for further powers necessary to enable the Receiver to properly perform its duties, or for termination of the Receiver's appointment.

5.  **Other Parties' Obligations.**  Defendants and Subsidiary LLCs and their officers, directors, agents, representatives and employees, contractors, and subcontractors, including without limitation any property management firm, company or individuals retained by Defendants and Subsidiary LLCs and their employees, and all persons with actual or constructive knowledge of this Order and their agents and employees, shall turn over to the Receiver, within two (2) business days after presentation of this Order:

A.  The possession of the Receivership Estate, including all keys to all locks related to assets of the Receivership Estate, all bank accounts, deposit accounts, security deposits, codes, access codes, security codes, passwords, and the records, books of account, ledgers and all business records for the Receivership Estate (including, without limitation, the plans, specifications and drawings relating to or pertaining to any part or all of the Receivership Estate), wherever located and in whatever mode maintained (including, without limitation, information contained on computers and any and all software relating thereto as well as all banking records, statements, and cancelled checks);

B.      All documents that constitute or pertain to licenses, permits or governmental approvals relating to the Receivership Estate;

C.      All documents that constitute or pertain to insurance policies, whether currently in effect or lapsed, that relate to the Receivership Estate;

D.      All leases and subleases, royalty agreements, licenses, assignments or other agreements of any kind, whether currently in effect or lapsed, that relate to the Receivership Estate;

E.      All documents pertaining to past, present or future construction of any type with respect to all or part of the Receivership Estate;

F.      All documents pertaining to toxic chemicals or hazardous materials, if any, ever brought, used and/or remaining upon the Collateral, including, without limitation, all reports, surveys, inspections, checklists, proposals, orders, citations, fines, warnings and notices;

G.      All Proceeds derived from the Receivership Estate;

H.      All books, records, including payroll records and personnel files, and accounts relating to the Receivership Estate, and all other records, documents, insurance policies and instruments of whatever kind and nature which relate to the operation and control of any part of the Receivership Estate; and

I.      All financial institutions, credit card processors, insurance agents or underwriters, utility providers, vendors, suppliers, tradesmen, materialmen, service providers, franchisors, taxing agencies, and all government agencies and departments are hereby ordered to take direction from the Receiver as it relates to the accounts of Defendants or Subsidiary LLCs and to surrender any and all funds held on deposit or apply said funds as directed by the Receiver.

6.      **Utilities.**  Any utility company providing services to the Receivership Estate, including gas, electricity, water, sewer, trash collection, telephone, communications or similar services, shall be prohibited from discontinuing service to the Receivership Estate

based upon unpaid bills incurred by Defendants.  Further, such utilities shall transfer any deposits held by the utility to the exclusive control of the Receiver and be prohibited from demanding that the Receiver deposit additional funds in advance to maintain or secure such services.

7.     **Mail.**  The Receiver may issue demand upon the U. S. Postal Service that the U.S. Postal Service grant exclusive possession and control of mail, including postal boxes, as may have been used by Defendants or Subsidiary LLCs and may direct that certain mail related to the Receivership Estate and its business be re-directed to the Receiver.

8.     **Insurance.**   The Receiver shall determine upon taking possession of the Receivership Estate whether in the Receiver's judgment, there is sufficient insurance coverage.  With respect to any insurance coverage in existence or obtained, the Receiver and the property management company, if one exists, shall be named as additional insureds on the policies for the period of the Receivership.  If sufficient insurance coverage does not exist, the Receiver shall immediately notify the Court and shall have thirty (30) calendar days to procure sufficient all-risk and liability insurance on the Receivership Estate (excluding earthquake and flood insurance) provided, however, that if the Receiver does not have sufficient funds to do so, the Receiver may seek an Advance from Plaintiff and increase the coverage.  The Receiver shall not be responsible for claims arising from the lack of procurement or inability to obtain insurance.  Defendants and Subsidiary LLCs and their property managers, employees, agents, affiliates and insurer are prohibited from cancelling, reducing, or modifying any and all insurance coverage in existence with respect to the Receivership Estate that are in effect as of the date of this Order without the consent of Receiver.

9.     **Use of Funds.**  The Receiver shall pay only those bills that are reasonable and necessary for the operation or the protection of the Receivership Estate, according to the Budget, and shall allocate funds in the following order of priority: (1) the costs and expense of the Receivership Estate including utilities, insurance premiums, general and

special taxes or assessments levied on the real property and improvements thereon, receivership fees, professional fees, attorneys' fees, etc.; (2) the creation and retention by the Receiver of a reasonable working capital fund, according to the Budget; and (3) amounts due to Plaintiff.

        10.   **General Provisions**

        A.   **Civil Claims**.  No person or entity shall file suit against the Receiver, or take other action against the Receiver, without an Order of this Court permitting a suit or action to proceed; provided, however, that no prior Court Order is required to file a motion in this action to enforce the provisions of this Order or any other Order of this Court in this action.

        B.   **Personal Liability to Creditors**.  The Receiver and its employees, agents, accountants and attorneys shall have no personal liability in connection with any liabilities, obligations, liens or amounts owed to any of the parties and any of Defendants' creditors because of its duties as Receiver.  Nothing in this Order shall grant any rights to trade creditors or general unsecured creditors, whose rights shall be solely determined in accordance with federal law.

        C.   **No Personal Obligation of Receiver.**  No obligation incurred by the Receiver in the good faith performance of its duties in accordance with the orders of this Court, whether pursuant to any contract, by reason of any tort, or otherwise, shall be Receiver's obligation or the personal obligation of its principals or agents.  Rather, the recourse of any person or entity to whom the Receiver becomes obligated in connection with the performance of its duties and responsibilities shall be solely against the Receivership Estate.  The Receiver shall have no obligation to advance its own funds to any costs and expenses of the Receivership Estate and the Receiver shall not be liable for any Receivership Estate or receivership obligations.  The Receiver is authorized to use Defendants' or Subsidiary LLCs' taxpayer identification numbers to establish and open bank accounts, issue financial reports, open, administer or close accounts with vendors or

utilities suppliers, with respect to marketing or sale of the Receivership Estate or any loans relating thereto, and for other accounting and financial related purposes. The Receivership Estate shall indemnify and hold harmless the Receiver and its principals and agents from any claims against the Receiver which arise out of the Receiver's operation of this Receivership in a manner consistent with and within the scope of this Order, unless the Receiver has committed fraud and gross negligence in the administration of its duties.  The Receiver and its principal and agents shall not be liable for any action or omission of Plaintiff or any Defendant.

11.    **No Lender Liability and No Limit on Lender Remedies**.  Plaintiff and its present and former officers, directors, shareholders, employees and agents, subsidiaries, and their heirs, personal representatives, successors and assigns shall not be liable for: (i) any action or omission of the Receiver, or (ii) defects, deficiencies, flaws, expenses, costs or other matters relating to the Receivership Estate.  Nothing in this Order shall be deemed to limit or prohibit Plaintiff from initiating and/or completing a uniform commercial code sale or other disposition of the Receivership Estate or from negotiating and completing an acceptance of collateral.

12.    **Non-Interference with Receiver.** All creditors of Defendants, all persons or entities with actual knowledge of this Order, including, without limitation, the parties to this action, and the officers, directors, members, principals, affiliates, agents, servants and employees (current or former) of Defendants or Subsidiary LLCs, are enjoined from:

(a)    Interfering with the Receiver, directly or indirectly, in the management and operation of the Receivership Estate or business operations of Defendants or Subsidiary LLCs;

(b)    Interfering with the Receiver, directly or indirectly, in the collection of revenues derived from the Receivership Estate or the business operations of Defendants or Subsidiary LLCs;

(c)     Collecting or attempting to collect from the Receivership Estate or Defendants or Subsidiary LLCs;

(d)     Extending, dispersing, transferring, assigning, selling, conveying, devising, pledging, mortgaging, creating a security interest in or disposing of the whole or any part of the Receivership Estate without the prior written consent of the Receiver and this Court;

(e)     Terminating any agreement with Defendants or Subsidiary LLCs without prior Court approval; and

(f)     Any act which directly or indirectly interferes in any manner with the discharge of the Receiver's duties under this Order and the operation and management of the Receivership Estate, Defendants' or Subsidiary LLCs' business.

13.     **Termination.**  The Receiver or any party may request the Receivership be terminated upon the full payoff of Plaintiff's Indebtedness secured by the Loan Documents, upon the completion of a valid foreclosure of the Receivership Estate, or upon the acquisition of the Receivership Estate by Plaintiff or any assignee in satisfaction of the indebtedness, or if the Receivership is otherwise no longer necessary. Upon termination of the Receivership, the Receiver shall relinquish possession and control of the Receivership Estate to the appropriate party.  Upon relinquishing possession and control of the Receivership Estate, the Receiver shall be relieved from all further duties, liabilities and responsibilities relating to the Receivership Estate and shall thereafter submit the Receiver's final account and report for Court approval and discharge.

Dated this 1st day of June, 2020.

_____
Honorable Diane J. Humetewa
United States District Judge